UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CR-330-H

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| ANDRE A. WATERMAN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the Court on the motion of Defendant Andre A. Waterman ("Defendant"), to suppress evidence seized subsequent to a police stop and search of a vehicle driven by Defendant. [DE-13.] The Government filed a response in opposition to the motion to suppress. [DE-16.] To further develop the record, the Court conducted an evidentiary hearing on September 7, 2010, at which the Government and Defendant with counsel appeared. This matter is now ripe for decision.

## STATEMENT OF THE CASE

On November 5, 2009, a Federal Grand Jury charged Defendant in a one count indictment, which read that: "On or about May 9, 2009, in the Eastern District of North Carolina, ANDRE ANTHONY WATERMAN, defendant herein, having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce a firearm, that is a Republic Arms Patriot, .45 semi-automatic pistol, in violation of Title 18, United States Code, Sections 922(g)1 and 924." [DE-1.]

Defendant moved to suppress all evidence seized based on the assertion that there was no legal basis for the stop of his vehicle, and as a result the search of his vehicle and seizure of

evidence was illegal. [DE-13.] The Government contends that the stop was constitutionally and statutorily valid, and that therefore the search and seizure was reasonable. [DE-16.]

## STATEMENT OF THE FACTS

Officer William Roberson ("Officer Roberson") and Officer Benjamin Deese ("Officer Deese"), both officers with the Garner Police Department ("GPD"), testified at the evidentiary hearing on September 7, 2010 regarding a traffic stop and search involving Defendant that took place on May 9, 2009 and were the sole witnesses. The Court finds the following facts based on their testimony.

### A. Testimony of Officer Roberson

Officer Roberson has been a law enforcement officer since 1998 and has been with the GPD since 2002. Previously, Officer Roberson had worked for the Shelby Police Department as well as the Raleigh Police Department. Since early 2009, he has been a K-9 Officer for the GPD and works in tandem with his K-9 partner. As a K-9 Officer, Officer Roberson's main duties relate to investigating drug-related incidents and the tracking of suspects. He also regularly participates in license checkpoints. Prior to his assignment with the K-9 Unit, he was a member of the GPD Special Response Team.

Officer Roberson was on duty during the early morning hours of May 9, 2009 and participated in a GPD-coordinated license checkpoint on Junction Boulevard between Tryon Road and Garner Station Boulevard in Garner, NC, near the Raleigh city line.[1] The checkpoint was located in a mixed use area; there are several apartment complexes as well as businesses on that stretch of Junction Boulevard. The area is often the site of police checkpoints because it has

---

[1] Officer Roberson testified that he does not remember exactly how he came to be involved in that evening's checkpoint. However, he believes that he received a message via the GPD's Computer Assisted Dispatch ("CAD") system, the method by which most checkpoints are arranged. The only other possibility would have been via a message received on his GPD Nextel device.

2

"just enough" traffic but is not so busy so as to cause any traffic backup or danger to motorists. Four or five officers were involved in the checkpoint on this particular night, each of whom was in uniform and driving a marked patrol car. At least one vehicle had its blue lights on and flashing to indicate that a checkpoint was taking place. Though it was nighttime, the weather was clear and the area was well-lit by streetlights. Officer Roberson has participated in checkpoints both prior to and since the night in question, and described the checkpoint of May 9, 2009 as "routine."

At approximately 12:40 a.m., Officer Roberson observed a small grey Honda SUV approaching the checkpoint. When the vehicle was about 200 feet away from the checkpoint, it stopped. Officer Roberson waved the vehicle down, at which time it continued towards the checkpoint; however, it continued to periodically pause as it approached. Officer Roberson spoke to the driver, who turned out to be Defendant, and asked him for his driver's license. Defendant indicated that he did not have it with him but that he knew the number, which he provided. While Officer Roberson was writing down the license number, Officer Deese, another GPD officer involved in the checkpoint, indicated to him that he had seen a gun in the car while walking around it.[2] As a result, Officer Roberson asked Defendant to step out, took him to the rear of the vehicle, and proceeded to handcuff him. There were no other occupants in the vehicle.

After securing Defendant, Officer Roberson searched the cabin of the vehicle and located an unloaded .45 semi-automatic pistol under the front driver's seat. Officer Roberson also noticed a clear baggie containing a substance which appeared to be marijuana under the seat. He secured the handgun in his patrol car and brought his K-9 partner to the vehicle; the K-9 alerted

---

[2] For a detailed description of Officer Deese's observations, see Section B, *supra*, "Testimony of Officer Deese."

on the driver's seat, indicating the clear baggie. At this time, Officer Roberson also secured the baggie in his patrol car. The baggie was later determined to contain 2.0465 ounces of marijuana.

Officer Roberson, along with another GPD officer, Officer Pleasants, took Defendant to the GPD sub-station. While there, Defendant admitted that he was a convicted felon and Officer Roberson called the magistrate to confirm this statement. Defendant was cooperative, polite, and did not resist in any way. Officer Roberson ultimately left Defendant in the care of Officer Pleasants at the Wake County facility and returned to duty, having no further contact with Defendant or involvement in the booking process.

### B. Testimony of Officer Deese

Officer Deese has been a law enforcement officer with the GPD since 2005. He is currently a Traffic Safety Officer. He regularly participates in license checkpoints as part of his duties. Prior to this assignment, he also spent time as a member of the GPD Special Response Team.

Officer Deese also participated in the May 9, 2009 checkpoint on Junction Boulevard, working in tandem with Officer Roberson to inspect the stopped vehicles.[3] Officer Deese has participated in many checkpoints while with the GPD, and described the May 9, 2009 checkpoint as not "anything out of the ordinary." He also observed Defendant's vehicle pausing frequently as it made its way to the checkpoint. After Defendant's vehicle had reached the checkpoint and Officer Roberson had begun to speak with Defendant, Officer Deese began to walk around the vehicle. Since it was nighttime, Officer Deese used a Surefire G2 LED black polymer flashlight with focus beam to see into the vehicle. He first stopped at the rear passenger's side window,

---

[3] Officer Deese, like Officer Roberson, does not remember exactly how he came to be involved in that evening's checkpoint; however, he agreed with Officer Roberson that it was most likely set up by a message via the GPD's CAD system. He testified that 90-95% of checkpoint assignments are received that way, and the rest are received via an officer's GPD-issued Nextel device.

4

from where he noticed that the driver's seat was leaned all the way back. Believing that this might be in an attempt to hide something behind the seat, he continued on to the rear driver's side window to get a better look. Unable to see anything more from this vantage point, he then proceeded to the front passenger's side window, which was untinted. From there, he was able to see what he believed to be the backstrap of a gun protruding from under the seat. He was able to recognize it as such based on both his general law enforcement training as well as from his time spent on the GPD Special Response Team.

After seeing what he believed to be a gun, Officer Deese notified Officer Roberson of the situation by saying "1032," the code word for the presence of a firearm. Officer Roberson nodded in acknowledgment and asked Defendant to step out of the vehicle. After Officer Roberson secured Defendant, he asked him about the gun, to which Defendant responded, "What gun?" and looked surprised. At that point, Officer Deese returned to his patrol car. He did not assist Officer Roberson and Officer Pleasants in transporting Defendant to the sub-station. Instead, he walked up to the area where Defendant's car had paused prior to arriving at the checkpoint to investigate; however, he did not see anything unusual. Officer Deese had no further involvement with Defendant or the booking process.

## FRAMEWORK FOR ANALYSIS

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. Stopping of a vehicle by police at a checkpoint constitutes a seizure of a person within the meaning of the Fourth Amendment. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990). Thus, police checkpoints, like other seizures, are "ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). However, the Supreme

5

Case 5:09-cr-00330-H   Document 28   Filed 09/21/10   Page 5 of 13

Court has recognized some limited circumstances in which suspicionless vehicle stops at checkpoints may be justified. *Id.* at 32. For example, the Supreme Court has upheld the constitutionality of police checkpoints where the primary purpose was the detection of drunk drivers, *Sitz*, 496 U.S. 444, and illegal immigrants, *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). Of particular relevance here, the Supreme Court has also suggested in dicta that a checkpoint at which all oncoming traffic was stopped in order to verify drivers' licenses and vehicle registrations would be permissible under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *see also Edmond*, 531 U.S. at 32. The Fourth Circuit has also indicated its approval of such license and registration checkpoints. *United States v. Brugal*, 209 F.3d 353, 357 (4th Cir. 2000) (en banc) (observing that "courts have concluded that a brief stop at a checkpoint for the limited purpose of verifying a driver's license, vehicle registration, and proof of insurance is a reasonable intrusion into the lives of motorists and their passengers even in the absence of reasonable suspicion that a motorist or passenger is engaged in illegal activity").[4] However, in contrast to these limited exceptions, the Supreme Court has explained that a checkpoint set up for the primary purpose of only a "general interest in crime control" would *not* justify a suspicionless stop under the Fourth Amendment. *Edmond*, 531 U.S. at 41-42.

Once a court determines that a checkpoint's primary purpose is a permissible one, that does not end the inquiry. In addition, it must judge the reasonableness of the particular checkpoint in question on the basis of its individual circumstances. *United States v. Lidster*, 540 U.S. 419, 426-27 (2004). This requires balancing three factors: "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and

---

[4] Other circuits have similarly approved of license and registration checkpoints. *See e.g. United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998).

6

the severity of the interference with individual liberty." *Id.* at 427 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

Thus, when considering a constitutional challenge to a police checkpoint, this Court must essentially undertake a two-step analysis. First, the Court must determine the primary purpose of the checkpoint. *Edmond*, 531 U.S. at 48. Then, if the checkpoint's purpose is deemed legitimate, the Court must further inquire into the reasonableness of the particular checkpoint on the basis of its individual circumstances. *Lidster*, 540 U.S. at 426. Only then can a court conclude that a checkpoint seizure passes constitutional muster.

## DISCUSSION

Defendant first argues that the checkpoint's primary purpose was a "general interest in crime control," and that therefore, his suspicionless stop was not justified. Defendant next argues that, even if the primary purpose of the checkpoint was valid, it was not reasonable in light of its individual circumstances. As a result, Defendant concludes that because the checkpoint seizure was unlawful, all evidence from the search of his vehicle should be suppressed. The Court disagrees. Furthermore, the Court has considered the issue of whether Defendant's continued detention after his initial stop was lawful, and concludes that nothing occurring subsequent to the initial checkpoint seizure gives rise to grounds for suppression.

### A. Primary purpose of the checkpoint

Defendant argues that the primary purpose of the May 9, 2009 checkpoint on Junction Boulevard was the impermissible purpose of a "general interest in crime control." At oral argument, Defendant pointed to a number of details in support of this proposition, including the facts that: (1) the GPD Traffic Safety Lieutenant was not involved in or present at the checkpoint; (2) the directive setting up the checkpoint came from an unidentified source; (3) the

7

Case 5:09-cr-00330-H Document 28 Filed 09/21/10 Page 7 of 13

checkpoint had no set time frame or duration; (4) the person questioning Defendant was a K-9 officer and not a Traffic Safety Officer; (5) Officer Roberson did not ask for Defendant's registration or insurance; (6) Defendant was never charged with driving without a license; (7) there was no reason why a second officer was necessary; and (8) Officer Deese was walking around Defendant's vehicle looking for "anything in plain view."

The Court does not find that these circumstances indicate that the checkpoint's purpose was an impermissible "general interest in crime control." *Prouse* and subsequent cases have been clear that a license and registration checkpoint poses no constitutional issue in and of itself. *See Prouse*, 440 U.S. 648; *Brugal*, 209 F.3d 353. Rather, the evidence suggests that the GPD set up their checkpoint in the interest of highway safety via the enforcement of license and registration laws. No significant evidence has been introduced to indicate any other ulterior purpose. Nevertheless, the Court shall address Defendant's concerns as follows: (1) Requiring the Traffic Safety Lieutenant to be present at all checkpoints would unnecessarily restrict the ability of the GPD to set up checkpoints at necessary times; (2) Though Officers Roberson and Deese could not recall exactly who had communicated their assignment to the May 9, 2009 checkpoint to them, the Court is satisfied that it was someone with appropriate authority from within the GPD's internal dispatch CAD system or via a GPD-issued Nextel device; (3) The Court is untroubled by the lack of a set time limit on the checkpoint, given Officer Roberson's testimony that they usually last 1-2 hours; (4) Even if there were merit to the argument that only a Traffic Safety Officer can participate in a checkpoint, the Court notes that Officer Deese was in fact such an officer and whether he or his partner Officer Roberson happened to actually "speak" to Defendant is of no import; (5) Officer Roberson testified that he did not ask for registration or insurance so as to not hold up motorists unnecessarily, and in this case, evidence of a more

8

Case 5:09-cr-00330-H Document 28 Filed 09/21/10 Page 8 of 13

serious situation than driving without a license had presented itself before he had the opportunity to ask for additional documentation; (6) There is no requirement that a defendant be charged with the first offense which comes to the attention of law enforcement if a more serious one is later discovered; and (7)-(8) By walking around the vehicle, Officer Deese was taking appropriate steps to secure the situation.

Additionally, Defendant places great weight on the factual similarities between this case and the case of *State v. Rose*, 612 S.E.2d 336 (N.C. Ct. App. 2005) in arguing that the checkpoint at issue here was for the impermissible purpose of a "general interest in crime control." However, the Court finds that *Rose*, in addition to not being binding on this Court, is not especially persuasive in the present matter. In *Rose*, the North Carolina Court of Appeals found that the trial court had accepted an officer's labeling of a checkpoint as a license and registration checkpoint without conducting an adequate review and remanded for a more thorough inquiry into the checkpoint's primary purpose to ensure that it was not merely a "general interest in crime control." Testimony showed that, among other things, the police department in question had placed their checkpoints *completely* at random and had offered no explanation whatsoever as to why there was a need for a checkpoint in the location involved. These facts are not especially analogous to the case at hand as Defendant suggests. Officers Roberson and Deese provided a perfectly adequate explanation of the GPD's policy and procedure regarding the setup of license and registration checkpoints. The Court has carefully considered all the available evidence and concluded after adequate review that Defendant's contentions are without merit. Accordingly, the Court finds that the primary purpose of the May 9, 2009 checkpoint was a valid interest in enforcement of license and registration laws.

9

Case 5:09-cr-00330-H Document 28 Filed 09/21/10 Page 9 of 13

## B. Reasonableness of the checkpoint

Defendant also argues that, even if the primary purpose of the May 9, 2009 checkpoint was a valid interest in enforcement of license and registration laws, it was not reasonable in light of its individual circumstances. Under *Lidster*, the relevant concerns that must be balanced in a determination of reasonableness are: (1) the "gravity of the public concerns" served by the checkpoint, (2) the degree to which the checkpoint "advances the public interest," and (3) the "severity of interference" with individual freedoms. 540 U.S. at 426. Defendant in particular argues that the first two *Lidster* factors are not met because Officers Roberson and Deese had unfettered discretion in carrying out the checkpoint.

Here, a balancing of these three factors clearly weighs in favor of the Government. Regarding the first factor, drivers who are unlicensed or uninsured are in violation of the law and may present a danger to the community. This is certainly a matter of significant public concern. Regarding the second factor, checkpoints such as the one the GPD set up on May 9, 2009 serve both to find and punish such drivers as well as discourage would-be unlawful drivers from driving in the first place. This is not only a sufficient but a substantial advancement of the public's interest in safer roads and drivers. Regarding the third factor, there is nothing in the record to indicate that the GPD officers unreasonably interfered with the freedom of law-abiding motorists who arrived at the checkpoint. All of the officers at the checkpoint were clearly identifiable as such and at least one patrol car had its blue lights flashing. The checkpoint was clearly visible to approaching motorists from at least 200 feet away. Additionally, Officer Roberson testified that he typically asks drivers only for their license so as to not hold them up unnecessarily. Only in cases such as Defendant's, when additional suspicious activity resulted in further investigation, were motorists held up more than briefly.

10

Case 5:09-cr-00330-H Document 28 Filed 09/21/10 Page 10 of 13

Defendant contends that because the officers were free to choose to ask for only a license (as opposed to a license and registration and/or insurance) that they had unfettered discretion, which ran afoul of the Fourth Amendment. However, Defendant misunderstands the severity of the unfettered discretion standard. The Supreme Court in *Prouse*, for example, disapproved of officers who were able to exercise "standardless and unconstrained discretion" in choosing which vehicles to stop or which vehicles warranted further investigation after a routine license and registration check. 440 U.S. at 661. Similarly, the Court in *Edmond* indicated that stopping all traffic would be a lawful means of removing offensive discretion. 531 U.S. at 39. Here, the officers stopped every vehicle; the Defendant conceded at oral argument that this weighed in the favor of the stop's constitutionality. What minor choice that the officers may have had in this case does not rise to the level of discretion required to violate the Fourth Amendment.

Furthermore, the Court notes that none of the eight facts raised by Defendant in his argument as to the nature of the checkpoint's primary purpose, though potentially relevant to the reasonableness determination as well, affect the outcome. Accordingly, the Court finds that the May 9, 2009 checkpoint was reasonable in light of its individual circumstances.

### C. Continued detention after initial stop

An additional matter that must be addressed is whether there is any obstacle to Defendant's further detention after his initial seizure.[5] An "initially permissible checkpoint seizure may transform into an impermissible one by further intrusions not based upon individualized suspicion or consent." *Brugal*, 209 F.3d at 357 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975) and *Sitz*, 496 U.S. at 451). When an officer seeks to expand

---

[5] Defendant references this issue briefly in his written motion by suggesting that Officer Deese "could not have seen any contraband inside the vehicle that Defendant was driving, and therefore did not have the 'reasonable suspicion' necessary to further detain the Defendant." Def.'s Mot. to Supp. at 5 [DE-13]. This was apparently in reference to the windows of Defendant's car being too tinted to reasonably see a gun through, an issue that Defendant appears to have conceded at oral argument.

an investigation beyond the primary purpose of the checkpoint, the officer may need to have "reasonable suspicion that the particular person seized is engaged in criminal activity" in order to proceed. *Sitz*, 496 U.S. at 451; *see also Brugal*, 209 F.3d at 357. However, if, in the process of stopping a vehicle at a license and registration checkpoint, an officer sees evidence of another crime, (s)he has the right to take reasonable steps to investigate the situation. *See Texas v. Brown*, 460 U.S. 730 (1983).

Here, the primary purpose of the checkpoint was valid and the individual circumstances of its execution were reasonable. Thus, there is no question that Defendant's initial seizure was proper. While Defendant was detained for the purpose of requesting his driver's license, Officer Deese observed what he believed to be a gun through the window. This alone constitutes sufficient reasonable suspicion of criminal activity to justify a search of Defendant's person and vehicle. In addition, Defendant's behavior in stopping his vehicle repeatedly prior to the checkpoint and proceeding only after being repeatedly flagged down is an indication of suspicious conduct. Officer Roberson, while engaged in a lawful checkpoint and presented with an individual that might be armed and dangerous, responded reasonably to the situation and acted to ensure the safety of himself and others. *See also Terry v. Ohio*, 392 U.S. 1 (1968).[6]

As a result of the foregoing discussion, the Court recommends that Defendant's Motion to Suppress be denied.

## CONCLUSION

The Court **RECOMMENDS** that Defendant's Motion to Suppress [DE-13] be **DENIED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the

---

[6] Furthermore, the Court notes that Defendant was unable to produce his driver's license at the checkpoint. Even assuming the number he gave Officer Roberson was his valid driver's license number, this does not change the fact that he was driving without a license in violation of North Carolina law, an offense for which he could have been arrested. Once Officer Roberson had probable cause to arrest Defendant, a search incident to that arrest would be proper, even if the search immediately preceded the formal arrest. *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991).

respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 21st day of September, 2010.

DAVID W. DANIEL
United States Magistrate Judge


